DEBORAH M. SMITH
Acting United States Attorney

STEPHEN COOPER
Assistant United States Attorney
Federal Building and U.S. Courthouse
101 12th Avenue, Room 310
Fairbanks, Alaska 99701-6282
Phone: (907) 456-0245
Fax: (907) 456-0577
E-mail: Stephen.Cooper@usdoj.gov

Attorneys for the Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 4:99-cr-2-JKS |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **STATUS REPORT IN** |
| ) | **OPPOSITION TO RELEASE** |
| ) | **PENDING REVOCATION** |
| SEDRIC O'NEAL WILLIAMS, ) | **PROCEEDINGS** |
| ) | |
| Defendant. ) | |
| ) | |

COMES NOW Plaintiff, the United States of America, and opposes any release or outpatient or treatment center placement of defendant pending proceedings on petition to revoke supervised release.

Defendant's supervised release began on October 11, 2005. His admitted violations of supervised release likewise began on October 11, 2005.

Defendant orally suggested in open court last Friday, February 3, that pending

the present proceedings defendant be moved to a drug treatment center, which is a non-secure facility in Anchorage. In further support of the request, defendant personally asserted that although he was convicted of theft of a firearm, he was not a violent person and had never been known to engage in violence, or words to that general effect.

Defendant evidently recognizes that a history of violent behavior would bear directly on his request for placement in an unsecure treatment center, and also on his suitability for any other kind of release pending the outcome of these proceedings. His denial of violent behavior therefore must be tested in light of the facts.

Defendant's unsuitability for release or for placement in any non-secure treatment facility is manifest in three parts of his history: 1) his juvenile criminal activities, 2) his adult criminal activities before involvement in the present case, and 3) his criminal conduct in relation to the present case.

The Presentence Report (PSR) cited herein is the Amended version dated February 24, 2000. There was an updated version dated August 16, 2001, following defendant's first appeal, but the portions here cited are the same as in the updated version.

    A.   <u>Juvenile Criminal History</u>

Defendant's juvenile history consists of juvenile delinquency adjudications for

criminal trespass, fourth degree assault, fourth degree criminal mischief, and false complaints. PSR ¶¶ 65-69, pp. 10-13.

In actual fact, the conduct underlying these adjudications as shown in the narratives following each of the cited provisions in the PSR, consisted of defendant's

- burglary of a dwelling,
- theft of a .44 caliber magnum pistol,
- kicking a juvenile female ten times,
- breach of a placement designation by cutting off an electronic monitoring device,
- auto theft,
- changing license plates to conceal auto theft,
- destruction of personal property of the car owner,
- possession of firearm in violation of probation,
- absconding,
- resisting arrest,
- curfew violation,
- absconding again, and
- using false name when arrested in possession of loaded firearm, pager and large amount of cash.

B.  Adult Criminal History

Defendant's adult record consists of convictions for false information, removal of merchandise (shoplifting), malicious destruction of property, assault and malicious destruction of property, driving while license revoked, false information, driving without valid license, and unauthorized entry. Id. ¶¶ 70-76, pp. 14-16.

His actual conduct included

- two failures to appear,
- three failures to comply with court orders for community service after convictions,
- failure to pay fine,
- domestic violence, and
- breaking the car window of his assault victim.

C.  Criminal Conduct in Relation to the Present Case

In the present case, defendant was part of gang which conspired to distribute cocaine and was responsible for distributions of between 5 and 12 ounces of cocaine per week in Anchorage. The gang called themselves the "10-7 Hoova Gangster Crips". PSR ¶ 9. The gang of six actually resided together in a rented house. Tr. Re-sentencing, December 3, 2001, at 23-26. The gang members were actively involved in the acquisition of firearms and bullet-proof vests for use in the

conspiracy. PSR ¶ 9.

In furtherance of this conspiracy, two of the gang members robbed an associate of one Brian Tiger, of Fairbanks, of $6000 with which the associate had intended to buy cocaine from the gang. PSR ¶¶ 11-14. Within a week, some of the gang including defendant planned a trip to Fairbanks to sell cocaine. Id. ¶ 15. While in Fairbanks, they ran into Tiger, and soon a confrontation at an apartment occurred in which one of the gang shot and killed Tiger. Defendant was a block or two from the apartment at that time carrying crack cocaine and a pistol, on his way to make a drug sale. He was arrested, the cocaine and eventually the gun were found, and he gave a false name to police but later admitted his identity and admitted he had possessed the gun. Id. ¶¶ 16-22. Defendant was convicted for this crack cocaine and the firearm, but those two counts were reversed on appeal.

On the one remaining count of conviction, defendant had stolen a Glock 10 mm. semi-automatic pistol from a citizen in Anchorage who was selling the gun to defendant. That occurred on May 16, 1998. Three days later, defendant used that gun in a shoot-out in a restaurant parking lot in Anchorage with a rival in the drug trade, Glenn Walls. Walls was injured. Crime Lab analysis established that the shell casings in the parking lot were fired in the gun defendant had just stolen. PSR

¶ 81.  The State did not prosecute defendant for this shooting.

Less than two weeks thereafter defendant shot another drug and/or gang rival, Guillermo Matos, in the head at close range, also in Anchorage, from a position close enough to leave contact or gunpowder marks on the side of Matos's head. Defendant fired from the side and slightly behind Matos, while Matos's head was turned away from defendant.  The shot blinded and crippled Matos for life. Defendant admitted to investigators that he had shot Matos, and claimed that Matos had a gun in his hand, but he admitted that Matos did not point the gun at defendant, did not even raise the gun from his side, and did not threaten defendant.  Tr. Sent. 12/3/01 at 33, 36-37, 38, 40; PSR ¶ 83.  Witnesses, however, said Matos was not armed.  Tr. 12/3/01 at 74.  Defendant claimed he used a .40 caliber Glock pistol to shoot Matos, and .40 caliber shell casings were found at the scene, which are interchangeable with 10 mm. ammunition and may be fired in a 10 mm. Glock.  Id. at 36-37.  The district court has found in the present case "by clear and convincing evidence" that defendant shot Matos with the stolen gun underlying the count of conviction in this case.  Id. at 82.  The State did not prosecute defendant for this shooting.

Defendant was seen participating in the fatal shooting of McKinley Nelson in

Anchorage on January 1, 1999. Nelson was at that time in a confrontation with another individual at East High School, when the vehicle of defendant's co-conspirator Antonio Fleming drove by, and defendant was seen shooting from that vehicle toward Nelson. It has not been determined which bullets struck and killed Nelson. Defendant has not been prosecuted in connection with this shooting. PSR ¶ 85(a).

On March 7, 1999, defendant was arrested on the warrant in this case, while he was at the Alaska Club gymnasium in Anchorage. His gym bag, with his personal papers and identification inside, contained 2.8 grams of cocaine and a loaded and cocked .45 caliber semi-automatic pistol. PSR ¶¶ 37-39. His acquittal of the two charges in the present case, counts 6 and 7, possession of cocaine with intent to distribute, and carrying a firearm in relation to a drug felony, resulted not from any doubt that defendant possessed the drugs and the firearm but only from insufficient drug quantity to show intent to distribute, and thus lack of a drug felony to support the firearm charge. See jury note, November 17, 1999.

Although defendant was only convicted in this case of stealing the 10 mm. Glock from Timothy Burns, the district court made significant findings as to defendant's violent behavior with that firearm, in connection with defendant's

sentencing:

> I think that it's important to stress that even if the particular circumstances surrounding the shooting of Matos and Walls had elements of Self-defense or self-protection, clearly having that weapon and taking that weapon served to embolden Mr. Williams into putting himself in positions where significant violence was likely to take place. So I think there's a clear nexus between stealing this weapon and those violent activities, even if at the particular moment in time Mr. Williams had an argument to himself that he was only protecting himself.

Tr. 12/3/01 at 84.

> It appears that the evidence is overwhelming, clearly more than clear and convincing, that Mr. Williams didn't steal this firearm because he liked firearms; he stole it in order to embolden himself in connection with his ongoing drug activity; and second, to use in protecting himself against people who were also involved in drug activity but were also part of a violent milieu in which Mr. Williams found himself.

Id.

> I think . . . all the evidence points to the fact that the weapon was not stolen as kind of a lark but in fact was part of a concerted plan by Mr. Williams in order to strengthen his position in the drug conspiracy that he was involved in and provide him a very potent weapon in connection with a number of confrontations that he anticipated he would be involved in.

Tr. Continued Re-Sentencing, January 14, 2002, at 7.

> And I'm not suggesting that at the time he stole the weapon he intended to go out and murder Walls or Matos, but I do think that he intended to put himself in a position – in fact enjoyed the idea of putting himself in a position – where violence would take place, including deadly violence from firearms.

Id. at 20.

Accordingly, defendant was sentenced under the drug guideline for stealing the firearm, because the cross-reference applied for possessing the gun in connection with another felony offense, namely, the drug conspiracy. Id. at 20-21. The court further found that the grounds for an upward departure under U.S.S.G. § 5K2.9 had been met:

>I think 5K2.9, facilitate other offenses, I don't think there's any question that the weapon was stolen in order to facilitate drug dealing and facilitate Mr. Williams being able to engage in violent confrontations with others.

Id. at 22.

Rather than apply the upward departure, the court chose to sentence defendant at the top of the applicable guideline range of 70 to 87 months.  Because of the connection of this crime with defendant's drug dealing and violence, the court sentenced defendant to 87 months' imprisonment for stealing the Glock pistol.  Id.

Thus, this Court must consider whether defendant should be trusted on the streets of Anchorage, or indeed anywhere but inside a secure facility, in light of his record of burglary, stealing firearms, auto theft, assaults, probation violations, twice absconding, resisting arrest, two failures to appear, three failures to comply with court orders after convictions, drug dealing, gang-related conspiracy and violence, stealing a firearm in order to engage in gang violence and drug dealing, using the stolen gun within two weeks in two shootings with intent to kill, and participating in a fatal shooting within seven months thereafter.

For these reasons, defendant's request for release to any non-secure facility for

any reason should be denied.

    RESPECTFULLY SUBMITTED this 9th day of February, 2006, at Fairbanks, Alaska.

> DEBORAH M. SMITH
> Acting United States Attorney
>
> s//STEPHEN COOPER
> STEPHEN COOPER
> Assistant United States Attorney
> Federal Building and U.S. Courthouse
> 101 12th Avenue, Room 310
> Fairbanks, Alaska 99701-6282
> Phone: (907) 456-0245
> Fax: (907) 456-0577
> E-mail: Stephen.Cooper@usdoj.gov
> AK #6911028